TOWN OF LA POINTE, Plaintiff-Respondent,

v.

MADELINE ISLAND FERRY LINE, INC., Defendant-Appellant.

Court of Appeals

*No. 93–0861. Submitted on briefs September 7, 1993.—Decided October 26, 1993.*

(Also reported in 508 N.W.2d 440.)

On behalf of defendant-appellant, the cause was submitted on the briefs of *Jack A. Carlson* of *Spears, Carlson & Lindsey* of Washburn.

On behalf of plaintiff-respondent, the cause was submitted on the brief of *Matthew Anich* of *Dallenbach, Anich & Wartman, S.C.,* of Ashland.

Before Cane, P.J., LaRocque and Myse, JJ.

LaROCQUE, J.   Madeline Island Ferry Line, Inc. (the Ferry), appeals a trial court judgment concluding that it was not exempt under sec. 70.111(3), Stats., from personal property taxes on its three ferry boats. On appeal, the Ferry argues that sec. 70.111(3) exempts from personal property taxes any boat employed in interstate commerce, and that because its boats are employed in interstate commerce, its boats are exempt from taxation. We agree and therefore reverse.

The Ferry owns three vessels that it operates exclusively in Wisconsin between LaPointe on Madeline Island and Bayfield between April and December. In 1990, LaPointe assessed the boats for personal property taxes. When the Ferry failed to pay the taxes in full, the town filed suit to recover the unpaid portion. The stipulated facts indicate that during the months it operates, the Ferry provides an indispensable link to all vehicular trips where the island is either a starting point or destination. Surveys of vehicles using the Ferry on an average August day indicate approximately 50% do not have Wisconsin license plates. On average, the Ferry transports nearly 100 tour buses to the island each year, and between 47% and 66% of these are out-of-state tours that prearrange their transportation on the Ferry. The Ferry has a contract with the United States Postal Service to carry mail to and from the island, and also serves as a parcel carrier and pickup and drop-off point for United Parcel Service (UPS). It also ships packages for Federal Express. A large number of these shipments either originate or are headed outside Wisconsin. The Ferry also ships large amounts of cargo to the island, including construction,

energy and restaurant supplies. A significant amount of this cargo is shipped to the island by out-of-state distributors from locations throughout the United States, Canada and Europe.

At trial, the Ferry argued that its vessels were employed in interstate commerce and consequently exempt from personal property taxes under sec. 70.111(3), Stats. Section 70.111(3) exempts all "watercraft employed regularly in interstate traffic." The trial court concluded that to be exempt under the statute, a boat must move between states and that none of the Ferry's boats moved between states. It further concluded that the boats were not employed in interstate commerce. Accordingly, the court entered judgment for LaPointe, and the Ferry filed this appeal challenging both of the court's conclusions. Other facts will be discussed as needed.

The Ferry first argues that the term "interstate traffic" as used in sec. 70.111(3), Stats., is synonymous with interstate commerce. We agree. The interpretation of a statute presents a question of law that we review de novo. *L & W Constr. Co. v. DOR*, 149 Wis. 2d 684, 688-89, 439 N.W.2d 619, 620 (Ct. App. 1989). In interpreting a statute, we are to give effect to the intent of the legislature. *Id.* at 689, 439 N.W.2d at 620. We must ascertain intent by first looking to the language of the statute itself and giving the language its ordinary and accepted meaning. *Id.* However, if upon examination we conclude that the statutory language is ambiguous, we may resort to judicial construction to ascertain and carry out the legislature's intent. *Kelley Co. v. Marquardt*, 172 Wis. 2d 234, 247-48, 493 N.W.2d 68, 74 (1992). A statute is ambiguous when capable of being understood by reasonably informed persons in

two or more ways. *State v. Moore*, 167 Wis. 2d 491, 496, 481 N.W.2d 633, 635, (1992).

■■■■

In addition, Wisconsin courts apply special rules when construing tax statutes. Normally, statutes dealing with tax exemptions are to be strictly construed against granting an exemption unless a claimant can point to an express provision that clearly brings the claimant within the terms of the exemption. *Gottfried, Inc. v. DOR*, 145 Wis. 2d 715, 719-20, 429 N.W.2d 508, 510 (Ct. App. 1988). However, if a statute exempting property from taxation is only one part of a general statutory scheme substituting a license or other impost in lieu of general taxation, then the statute is to be liberally construed in favor of the person required to pay taxes in the substituted license form. *Wisconsin Tel. Co. v. Milwaukee*, 85 Wis. 2d 447, 456, 271 N.W.2d 362, 366 (1978). Under sec. 70.15, Stats., any watercraft employed in interstate traffic is only required to pay to the town where the boat is assessable a sum equal to one cent per net ton of its registered tonnage, and it is exempt from further state or municipal taxation. Section 70.15 is thus a duty on watercraft regularly employed in interstate traffic that is in lieu of general taxation. Consequently, sec. 70.111(3) is entitled to liberal construction.

Section 70.111(3), Stats., states that the exemption only applies to watercraft "regularly employed in interstate traffic." The Ferry argues that "traffic" is synonymous with commerce, and that the phrase "interstate traffic" therefore means the same thing as "interstate commerce." The statutes do not define the phrase "interstate traffic." Nontechnical words used in a statute are given their ordinary and accepted meaning when not specifically defined; this meaning can be

ascertained from a recognized dictionary. *Cuna Mut. Ins. Soc'y v. DOR*, 120 Wis. 2d 445, 450, 355 N.W.2d 541, 543 (Ct. App. 1984). Webster's Third New Int'l Dictionary 2423 (unabr. 1976) defines "traffic" as "the circulation (as of vehicles or pedestrians) through an area: passage to and fro . . . ." Relying on this definition of traffic, the phrase "interstate traffic" suggests the movement of vehicles between states. However, the dictionary also defines "traffic" as "commercial activity, usu. involving import and export trade . . . the activity of exchanging commodities by bartering or buying and selling . . . ." *Id.* at 2422. Under this definition, traffic is synonymous with commerce, and "interstate traffic" can be read to mean "interstate commerce."

It is evident the statute is ambiguous; it is capable of being understood by reasonably informed persons to exempt watercraft either employed in moving between states or employed in interstate commerce. We therefore resort to judicial construction in an attempt to ascertain and carry out the legislative intent of sec. 70.111(3). In determining the legislative intent, we must examine the scope, history, context, subject matter and object of the statute. *State v. Pham*, 137 Wis. 2d 31, 34, 403 N.W.2d 35, 36 (1987).

Section 70.111(3), Stats., was originally enacted in 1949. Section 2, ch. 63, Laws of 1949. Prior to its enactment, watercraft regularly employed in interstate traffic were still exempt from personal property tax under sec. 70.15. *Wisconsin Transp. Co. v. Williams Bay*, 207 Wis. 265, 267-66, 240 N.W. 136, 137 (1932). Section 70.15 was enacted in 1911 as sec. 1042b, Stats.

(1911).[1] Section 1, ch. 324, Laws of 1911. Section 1042b, Stats. (1911), reads in part:

> Assessment of vessels. Section 1042b. 1. That in consideration of an annual payment into the treasury of any town, village or city where such property is assessable by the owner of any steam vessel, barge, boat or other water craft, owned within this state, or hailing from any port thereof, and employed regularly in interstate traffic in the navigation of international waters, of a sum equal to three cents per net ton of the registered tonnage thereof, such payment shall be received in lieu of all taxes, and said steam vessel, barge, boat or other water craft shall be and the same is hereby made exempt from all further taxation, either state or municipal.
>
> 2 . . . . All vessels, boats or other water craft not regularly employed in interstate traffic in the navigation of international waters, and all private yachts or pleasure boats belonging to inhabitants of this state, whether at home or abroad, shall be taxed as personal property.

To help place this statute in context, we turn to a brief review of the law of taxation of vessels as it stood in 1911.

In 1911, it had been settled that a state could tax a vessel used in interstate commerce as personal property without offending the commerce clause of the United States Constitution, art. I, cl. 3. *See, e.g., Old Dominion Steamship Co. v. Virginia*, 198 U.S. 299 (1905). This included taxation of vessels engaged in

---

[1] When enacted, this statute was misnumbered. The statutes of 1911 have two secs. 1042b; the first one deals with the assessment of vessels and the second with the assessment of tobacco.

interstate commerce even though they remained wholly within the waters of a single state. *Id.* The frequent disputes during this period did not involve whether these vessels could be taxed, but rather which state had the power to tax this property. The general rule in force at the time was that the vessel was taxable by the state in which its owner was domiciled unless it appeared the vessel had actual situs elsewhere. *Southern P. Co. v. Kentucky*, 222 U.S. 63 (1911); *Ayer & Lord Tie Co. v. Kentucky*, 202 U.S. 409 (1906). For a time it was thought a vessel might be taxed exclusively at its home port, whether or not it was also the owner's domicile, but this view was rejected in both *Ayer* and *Southern P. Northwest Airlines, Inc. v. Minnesota*, 322 U.S. 292, 314 n.2 (1944) (Stone, J. dissenting).

A vessel had actual situs in a state where its owner was not domiciled if it was used exclusively within that state. *Old Dominion.* In *Old Dominion*, the Court was faced with the question whether vessels owned by a Delaware corporation, but engaged in interstate commerce exclusively within the state of Virginia, could be taxed as personal property by Virginia. The court concluded that the vessels had their actual situs in Virginia, rather than at their home port or their owners' domiciliary, because they were used exclusively within that state. *Id.* at 309-10. Thus, they were taxable by Virginia.

Thus, at the time sec. 1042b, Stats. (1911), became law, Wisconsin had the power to tax as personal property either Wisconsin owned vessels that were not operated exclusively within another state or *nonresident owned vessels that operated exclusively within our state.* Section 1042b appears to embody the extent of this state's power to tax or exempt vessels in 1911; it applies to vessels that are owned within Wisconsin or

734

that sail from any Wisconsin port. Yet, if "interstate traffic" required movement between states, then the legislature's attempt to bring vessels sailing from Wisconsin ports within the ambit of sec. 1042b would have exceeded its constitutional authority. This state had no power to tax or exempt vessels owned by nonresidents simply because they sailed from Wisconsin ports. To conform with federal constitutional law, the only nonresident owned vessels sailing from Wisconsin ports this state could tax as personal property in 1911 were those operating exclusively within our waters. Thus, if we are to give meaning to the legislature's intent to tax vessels sailing from any port in Wisconsin, we must read "interstate traffic" to mean "interstate commerce" and not "moving between states."[2]

This interpretation is consistent with a common use of the phrase "interstate traffic" in 1911. For example, in *Chicago, B. & Q. R.R. Co. v. Railroad Comm'n*, 152 Wis. 654, 140 N.W. 296 (1913), *rev'd on other grounds*, 237 U.S. 220 (1915), the court was faced with the constitutionality of a statute requiring railroads to maintain a station in and stop once a day at any town with at least 200 people and a post office. The court noted:

[2] The requirement of sec. 1042b, Stats. (1911), that vessels be "regularly employed in interstate traffic in the navigation of international waters" appears to limit the application of the statute to those vessels navigating on the Great Lakes. At that time, some argued that the Great Lakes were international bodies of water and that Lake Superior was only declared not to be an international body of water in *Independent Tug Line v. Lake Superior Lumber & Box Co.*, 146 Wis. 121, 131 N.W. 408 (1911).

It is urged that if plaintiff should be required to stop one of its limited *interstate trains* it would have to do so at the expense of *interstate commerce* . . . . [E]ven from such small stations plaintiff's receipts from interstate passenger business is over one third that of its total passenger receipts. When, therefore, additional service is required, it is not accurate to say that it is at the expense of interstate traffic.

*Id.* at 671-72, 140 N.W. at 302. This usage is also common today; the Wisconsin Property Assessment Manual 15.12 (1992) also equates interstate traffic with interstate commerce in discussing sec. 70.111(3) and 70.15, Stats.[3] Therefore, construing sec. 70.111(3) liberally, our analysis leads us to conclude that "interstate traffic" in the statute means interstate commerce.

The Ferry next argues that it is regularly employed in interstate commerce and that its vessels are therefore exempt under sec. 70.111(3), Stats., from personal property taxes. Whether a person is engaged in interstate commerce is a question of law, and we review questions of law de novo. *See, e.g., Frito-Lay, Inc. v. Wisconsin Labor & Industry Review Comm'n*, 95 Wis. 2d 395, 400, 290 N.W.2d 551, 555 (Ct. App. 1980).

---

[3] The manual notes:

Boats employed regularly in interstate traffic are also exempt from the property tax . . . . The emphasis in this statute appears on the word "regularly" . . . . [I]t would appear that only those watercraft that were "usually" or "normally" engaged in *interstate commerce* could pay the one cent per net ton fee and be exempt from other taxes. For example, a ferry service between ports in Wisconsin and other states, such as Michigan, would be regularly employed in *interstate commerce* and exempt from property taxes. (Emphasis added.)

Transportation of persons from one state to another constitutes interstate commerce. *Port Richmond & B.P.F. Co. v. Board of Freeholders*, 234 U.S. 317, 326 (1914). When persons travel between states and a portion of their journey requires transportation by an independent agency solely within the boundaries of one state, that journey is still interstate in character. *United States v. Yellow Cab Co.*, 332 U.S. 218, 228 (1947). In *Yellow Cab*, the Supreme Court considered whether cabs that took passengers to and from the local train station were engaged in interstate commerce. The Court held the cabs were not engaged in interstate commerce under the facts of the case. Crucial to its decision was its analysis of when a passenger trip begins and ends. The Court noted that the beginning and end of a particular kind of interstate commerce must be marked by its own practical considerations. *Id.* at 231. In the case of passenger rail travel, the Court noted "the common understanding is that a traveler intending to make an interstate rail journey begins his interstate movement when he boards the train at the station and that his journey ends when he disembarks at the station in the city of his destination." *Id.* What happens prior to departure or subsequent to arrival is not a constituent part of the interstate movement absent special arrangements. *Id.* at 232.

The Court's analysis, however, suggested special arrangements that might make the local journey a constituent part of the interstate trip included cabs serving only railroad passengers, a contractual or other arrangement with interstate railroads, or fares paid and collected as part of the railroad fares. *Id.* at 231. Other courts have since found wholly local services to be constituent parts of an interstate journey. *See, e.g., Executive Town & Country Servs., Inc. v. Atlanta*, 789

F.2d 1523 (11th Cir. 1986) (limousine service to and from airport is interstate where vast majority of business consists of prearranged trips to and from the airport); *Charter Limousine, Inc. v. Dade Cty. Bd. of Cty. Comm'rs*, 678 F.2d 586 (5th Cir. 1982) (limousine service to and from airport is interstate where substantially all of service is prearranged by interstate communication before pickup, no on call or at random pickup, majority of passengers pay by either prepaid voucher or submit letter confirming payment).

Applying the principles of *Yellow Cab*, we conclude that the Ferry is employed in interstate commerce. The Ferry is an indispensable link in all vehicular trips with Madeline Island as a starting point or ultimate destination. The Ferry's service is not analogous to the cabs of *Yellow Cab*; its service is not provided locally at the start or finish of an interstate journey. Instead, its service is an absolute necessity because an interstate vehicular traveler cannot complete a journey to or from the island without taking the Ferry. Furthermore, an island resident cannot embark on an interstate journey by car without using the ferry. The record reflects that on an average day in August, roughly 50% of the automobiles taking the Ferry are from out of state. Well over 50% of the bus tours traveling to the island originate out of state, and all of these prearrange their transportation with the Ferry. We conclude that these figures demonstrate the Ferry is regularly employed in interstate commerce by transporting interstate passengers to or from Madeline Island.

The analysis of the cargo transported by the Ferry yields a similar conclusion. In determining whether the transportation of property constitutes interstate commerce, the controlling factor is the "essential character" of the shipment as evidenced by the fixed

and persisting intent of the shipper at the time of shipment. *Atlantic C. L. R.R. Co. v. Standard Oil Co.*, 275 U.S. 257, 269 (1927) (controlling fact is shipper's plan to store oil; no evidence of purpose to send it to interior points by immediate continuity of transportation); *Roberts v. Levine*, 921 F.2d 804, 812 (8th Cir. 1990) (citing current test employed by Interstate Commerce Commission). Intent is ascertained from all the facts and circumstances surrounding the transportation. *Id.* at 812. For example, if a shipper intends at the time of shipment that the goods be sent to a specific destination in another state, then those goods move in interstate commerce even though they may at first come to rest in a distribution center within the state and their shipment is later completed by a wholly local carrier. *Id.* at 814.

The Ferry has a contract to carry U.S. mail, and a large amount of this mail either originates from or is sent out of state. The addresses are evidence that the shippers of these letters and packages intend their mail to either go specifically to Madeline Island or from the island to an out-of-state destination. These goods retain their interstate character. The Ferry delivers several thousand parcels a year to the island for UPS, and a large number of these originate out of state. Many UPS parcels shipped off the island have out-of-state destinations. The Ferry provides a similar service to Federal Express. All of the parcels transported by the Ferry that come from or are headed to other states retain their interstate character.

Additionally, in the 1991-1992 season, the Ferry transported 5,385 tons of freight on deck and 7,395 tons of freight on trucks to the Island. Significant amounts of this freight came from out-of-state distributors and suppliers. The out-of-state cargo is diverse; it

includes a wide range of construction, energy and restaurant supplies originating from all forty-nine states, Canada and Europe. The only reasonable inference is that a significant amount of this cargo retains its interstate character because it is intended for Madeline Island at the time it is shipped there by the out-of-state suppliers and distributors.

Because the Ferry carries significant numbers of passengers, parcels and other freight that are moving in interstate commerce to and from Madeline Island, we conclude that it is regularly employed in interstate commerce within the meaning of sec. 70.111(3), Stats. It is therefore exempt from paying personal property tax subject to sec. 70.15. Accordingly, the trial court is reversed.

*By the Court*—Judgment reversed.